**DENNIS M. CHARNEY,** ISB # 4610
P.O. Box 171
Ten Sleep, WY 82442
Telephone: (208) 440-7200
Email: dennischarney@gmail.com

*Attorney for Defendant*
*Scott Laney*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No. 1:19-CR-0292-BLW** |
| Prosecution, | |
| vs. | **SCOTT LANEY'S PRE-TRIAL BRIEF/ OPENING STATEMENT** |
| SCOTT ALEXANDER LANEY | |
| Defendant. | |

## I. PROCEDURAL BACKGROUND

Scott Laney was charged with health care fraud and aggravated identity theft on September 10, 2019. A superseding indictment adding additional counts was filed on June 10, 2020. Mr. Laney has entered a not guilty plea and waived his right to a jury trial.

## II. CHARGING ELEMENTS

### A. Health Care Fraud
### 18 U.S.C. §§ 1347 and 2

The Model Criminal Jury Instructions outline the elements for health care fraud.[1] The government must prove that Scott knowingly[2] and willfully[3] executed a scheme or plan to do one of the following: a) to defraud a health care program, as defined in 18 U.S.C. § 24(b)[4], by means of material false or fraudulent pretenses, representations, or promise; or b) to obtain money or property owned by or under the custody or control of a health care benefit program, as defined in 18 U.S.C. § 24(b), by means of material false or fraudulent pretenses, representations, or promises. Second, the government must prove that Scott acted with intent to defraud; third, it must prove that Medicare and Medicaid was a health care benefit program; fourth, it must prove that the scheme or plan was executed in connection with the delivery or payment for health care benefits, items, or services.

---

[1] Federal Jury Instructions, 8.128A.

[2] An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful. See definition in Model Jury Criminal Instructions 5.7; in *United States v. Hong*, 938 F.3d 1040 (9th Cir. 2019), the Ninth Circuit discussed when it might be appropriate to give a deliberate ignorance (or willful blindness) instruction in the context of a charge of health care fraud (see Comment to Model Jury Criminal Instruction 8.128A.)

[3] See definition in Model Jury Criminal Instructions 5.5. In health care fraud cases, a "willful" act is one undertaken with "bad purpose" with knowledge that conduct was unlawful. See *United States v. Awad*, 551 F.3d930, 939 (9th Cir. 2009).

[4] "Health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

## B. Aggravated Identity Theft
## 18 U.S.C. §§ 1028A and 2

The government must prove, first, that Scott knowingly transferred, possessed, or used without legal authority a means of identification of another person or a false identification document, and; second, that Scott knew that the means of identification belonged to a real person; and third, that Scott did so during and in relation to health care fraud.[5]

## III. BACKGROUND

This case arises from Scott Laney's work in 2015 as a commissioned salesman for a national drug and genetic testing lab company called Millennium Health ("Millennium"). Scott's sales territory included southern Idaho, and his leads were area companies that needed to screen people for legal and illegal drug use. If a lead was interested in contracting with Millennium, then Scott's responsibility was to sign up the company and then submit the paperwork to Millennium. K&K Treatment ("K&K") and Dishion Enterprises ("Dishion"), Idaho entities, are the companies this case revolves around. As to K&K, Judge Lee, in Payette County, suggested to Kim Rostad, the owner of K&K that it utilize the services of Millennium to perform court ordered drug testing. Ms. Rostad reached out to Millennium, which in turn provided her with contact information for Mr. Laney. Shortly thereafter the two met, discussed the process, and entered into a business relationship per Judge Lee's request. As to Dishion, Mr. Laney heard from an associate that it, too, might be in need of testing services for its program—a program very similar to K&K. Mr. Laney reached out to the owner, Wade Dishion, explained the process and established a similar relationship between Dishion and Millennium. They both agreed to use Millennium lab services for drug testing, including urine specimen tests. Millennium rules required that a company ordering the UDT's to

---

[5] Model Criminal Jury Instructions, 8.83.

identify a health care provider and submit the name and the provider's National Provider Identifier ("NPI"). Millennium had specific forms for this purpose that Scott used according to company protocol. The NPI is a unique number issued by CMS to providers who apply and meet the criteria.[6] The government alleges that Scott knew that the third party providers were not providing individualized treatment to those being drug tested and thus, he knew the tests were not reasonable or necessary and should not be billed to Medicare or Medicaid. Further, the government alleges that Scott used the providers' names and NPI numbers on the New Customer Registration and custom profile forms without the providers' approval. Thus, the government alleges that this allowed Millennium to bill Medicaid and Medicare for unreasonable and unnecessary medical services. In this way, the government claims Scott facilitated the submission of fraudulent reimbursement charges.

## IV. GOVERNMENT'S EVIDENCE AND EXPECTED ARGUMENT

### A. Health Care Fraud
### 18 U.S.C. §§ 1347 and 2

**1. Whether Scott knowingly and willfully executed a scheme or plan to defraud a health care program by means of material false or fraudulent pretenses, representations, or promise.**

**a. Whether Scott executed a plan to facilitate a relationship without provider approval.**

The government will attempt to prove that Scott acted on his own or with another salesperson, Joe Johnson, to create business relationships between Millennium and other entities who would order lab tests that the government alleges were not reasonable or necessary. The government alleges that Scott and Joe were both regional salesman for Millennium during that time period and that on two occasions in April 2015, established business relationships relying on the following method: sign up a company in need of

---

[6] See 42 C.F.R. §§ 410.32 and 441.7.

drug testing services that did not employ its own provider, find a third party provider with an NPI number to use without the provider's knowledge and then submit the paperwork to Millennium and let Millennium file a claim for reimbursement. To prove this, the government has indicated it will call the owner of K&K, Kim Rostad, and the owner of Dishion Enterprises, Wade Dishion, to testify that they met with Scott, discussed Millennium drug lab testing services and the need for a third-party provider. They will testify that they agreed to use Millennium as their drug testing lab.[7] They will testify that they subsequently used Millennium drug testing services, that they did not bill Medicaid or Medicare for the service (even though they still collected a fee from the testing subjects), that they did not choose the Custom Profile drugs to be screened for, and that they did not have any contact with the medical providers listed on the New Client Registration and Custom Profile forms. Rostad and Dishion will testify that there was a significant financial incentive to switch to Millennium. Instead of paying for the tests with a portion of client money, they got to keep *all* of it.

The government will also call the two nurse practitioners, Alisha Phillips ("Alisha") and Brenda Hoyt ("Hoyt") who were the providers named on the Millennium forms. These providers now claim that they did not agree that their names and NPI numbers could be used as ordering providers for K&K and Dishion, that they did not work for K&K or Dishion and that they do not recognize the forms to which their names appear.[8] The forms in question are New Client Registration forms and two types of Custom Profile forms.

The government will likely call Agent Kreitzer, the main investigator in this case. Agent Kreitzer is an investigator specializing in healthcare fraud investigations. Agent Kreitzer will explain his investigation, offer his explanation of the term "necessary and reasonable" and explain that he obtained

---

[7] Defense Exhibits 2004-2009
[8] Defense Exhibits 2000-2002

records from Millennium showing that Millennium billed and was reimbursed by Medicaid between April 2015 and December 2015 for tests submitted by K&K and Dishion, which he claims should not have been paid.

**b. Whether Scott devised a plan to facilitate a relationship that resulted in billing for unreasonable and unnecessary drug testing.**

Besides alleging that Scott signed up providers who hadn't given their permission, the government will attempt to prove that Scott knew the IDAPA definition of "necessary and reasonable" and that he willfully and knowingly signed up the companies that could not meet the criteria of ordering medically necessary drug tests because they were fulfilling drug court orders instead of offering drug rehabilitation or treatment. To explain what medical necessity means and what services are excludable from reimbursement if they are not medically necessary, the government will call two additional Idaho Department of Health and Welfare employees who are experts in Medicaid law. They are expected to explain what medical necessity means and why a drug court testing requirement for those out on bond or probation, is not considered to be a medically reasonable or necessary covered drug screening test for reimbursement purposes. They will explain that Medicaid and Medicare required laboratory tests, including urine drug screening, to be ordered by a provider who was actually treating the subject. In their view, tests not ordered by a provider who was treating the beneficiary are not considered reasonable or necessary. Thus, in their view, drug screening tests required by a drug court, would not be covered. Finally, they will testify to the reimbursement procedures with respect to Millennium submitting reimbursement requests directly to Idaho Medicare and Medicaid programs.

It is unknown how the government intends to prove that Scott understood the complexity of these CFR's and IDAPA rules as the voluminous discovery in this case is devoid of proof on this important point.

**SCOTT LANEY'S PRETRIAL BRIEF/ OPENING STATEMENT—6**

2.      **Whether Scott acted with intent to defraud.**

While closely tied to the question of whether Scott had a plan or scheme to execute, the second element requires the government to prove beyond a reasonable doubt that Scott acted with intent to defraud. The government is expected to point to the providers' testimony that they did not give Scott permission to submit their names as providers and yet Scott did so anyway. It is also expected that the government will call Kristen Baker, a current manager and sales trainer for Millennium. She will discuss the details of an educational seminar she gave at a Millennium sales training conference that Scott attended in July 14, 2014, and she will discuss Millennium's internal understanding of medical necessity and reasonableness as it related to sales and sales materials and to custom profiles during the time frame in question. Additionally, Jake Knee, Scott's regional manager in 2015, will testify to his role in producing lead sheets and lead guidance for his sales force with regard to drug courts and treatment centers. Neither of these witnesses, however, can offer any insight into Idaho's definition in 2015 because both witnesses were operating under Millennium's understanding at the time – an understanding that cost Millennium nearly a quarter of a billion dollars in fines.


3.      **Whether Medicare and Medicaid was a health care benefit program and that the scheme or plan was executed in connection with the delivery or payment for health care benefits, items, or services.**

The government will produce documentation to support nine instances wherein Medicaid or Medicare were billed under Alisha or Brenda's NPI numbers. The defendant does not dispute that the programs were health care benefit programs.

## B. Aggravated Identity Theft
## 18 U.S.C. §§ 1028A and 2

**1. Whether Scott knowingly transferred, possessed, or used without legal authority a means of identification of another person or a false identification document.**

As set out previously, the government will rely on the two providers' testimony that they did not give Scott permission to use their names and NPI numbers on the K&K and Dishion New Client Registration and the Custom Profile forms.

**2. Whether Scott knew that the means of identification belonged to a real person.**

This will not be a contested issue. The defendant agrees that the means of identification belonged to Phillips and Hoyt.

**3. Whether Scott did so during and in relation to health care fraud.**

The government will produce documentation to support nine instances wherein Phillips or Hoyt's NPI was used to order a urine drug-screening. Phillips and Hoyt are expected to testify that, indeed, they did not order or authorize the tests.

## IV. DEFENDANT'S EVIDENCE AND RESPONSE

**1. Most material facts are undisputed.**

It is important to note that nearly every fact in this case is undisputed. If the government has not already established the following facts, the defense intends to prove that:

- Scott was a salesman for Millennium in 2015.

- Scott and Joe were teammates, so to speak, who regularly shared commissions.

- Scott and Joe were instructed/pressured by Millennium to explore new sales opportunities with drug court when that term was ill-defined. Joe has described the program as Millennium's "drug court initiative".

- Scott understood, due to his training and experience with Millennium, that each business in need of tests required a medical director, which could be a physician or non-physician such as a nurse practitioner. In fact, Scott gave a lecture, approved by Millennium in 2014, whereby he explained the process of establishing relationships between providers and clinics in need of such.

- Scott used his contacts to locate a provider for K&K after K&K called him seeking UDT services. K&K was a company that was required by the Payette county court system to conduct drug testing on some of its clients.

- On April 2, 2015, Scott met with Alisha Phillips. Scott already knew Alisha as she was already a Millennium customer who used custom profiles. Thus, because her practice was within close proximity to K&K and because she was already familiar with Millennium lab testing practices, Scott believed she was the reasonable one to ask to be a provider on behalf of K&K. She signed a New Client Registration form wherein she acknowledged the following:

  > I hereby acknowledge that Millennium Health (MH) will perform testing for my practice as directed by individual Test Requisition forms, which may incorporate Custom Profile (CP) if selected. I acknowledge that utilization of a CP is not required and that the authorized practitioners in my practice are responsible for selecting the individual test to be performed on each patient. I agree to only order the required individual tests that are medically necessary for the diagnosis and treatment of my patients. I further acknowledge that neither I nor my immediate family members have any financial relationship with MH not expressly permitted by the "Stark" physician self-referral law and regulations, nor have I been offered or provided anything of value in exchange for referral of testing to MH.

  She also, and importantly, signed two additional forms, one being an Oral Fluid Custom Profile form and another entitled Non-POC Custom Profile selecting those drugs that she believed would

be necessary for drug court testing. This meant that every time a test was ordered, the patient would be screened for the pre-selected substances on that custom profile. It is notable that Alisha's choices for drugs to be screened were different than those selected by Brenda Hoyt. While the government contends Scott had a plan that he executed between the months of April and March 2015, the only thing that is the same about the transactions is that Scott used existing Millennium forms and followed Millennium procedures. It was up to the Authorized Health Care Providers, in this case Phillips and Hoyt, to individually decide what drugs to choose for the facilities they were taking care of patients for. Further, the fact that the providers selected different tests supports Scott's contention that he sat down with Phillips and Hoyt individually and had them fill these forms out. Scott would not have known which tests to select for the particular practices. In any event, the Oral Fluid form that Alisha signed said:

> I understand that it is the policy of Millennium Health to provide HCP's the flexibility to order appropriate tests in combination, and also to ensure that the convenience of doing so does not compromise deliberate decision making as to which tests are medically necessary for a particular patient at a particular time. I understand that I may order any of the tests included in my Custom Profile individually, or in combinations different than that reflected in my Custom Profile, using Millennium Health Test Requisition. I agree that I will contact a Millennium Health representative without delay if, at any point in time, the test combination that makes up my Custom Profile no longer reflects the needs of my patients or if, for any reason, I would like to modify my Custom Profile. I understand that each individual test component of the Custom Profile I have designed will be billed with a separate CPT code, unless indicated otherwise on this form, and acknowledge that Millennium has provided me with a complete description of the codes it uses to bill the individual tests included in my Custom Profile, and the maximum Medicare reimbursement amount for each test. I understand that the Custom Profile that I have designed may call for quantitative testing as a second assay following an initial qualitative immunoassay test (conducted either in-office or by Millennium Health), and understand that it is appropriate to order this profile only when I have determined that quantitative testing is medically necessary for a particular patient. I understand that the use of Custom Profiles may result in the ordering of tests which are not covered, reasonable and/ or necessary and that when ordering test for which reimbursement may be sought from Medicare, Medicaid and other federally funded health care programs or third party payers, HCP's should be careful to order only tests that are medically necessary for diagnosis of treatment of the patient. I understand that billing a federally-funded health care program for tests that are not reasonable or necessary may violate federal law, and an authorized HCP who knowingly

orders such tests may be subject to civil, criminal and/or administrative sanctions for causing submission of a false claim. I understand the potential implications of establishing customized panels as described above and authorize Millennium Health to perform the Custom Profile I have created on this form, including each of the tests checked, each time I submit a specimen accompanied by a Test Requisition on which I have ordered my Custom Profile test option. The use of a Custom Profile is offered to me as a convenience, but there is no requirement to establish one since any test I wish to order for a patient can also be ordered on Millennium's standard Test Requisition forms. By signing this form, I acknowledge the stated understandings and authorization.

The Non-POC form that Alisha signed said:

I understand that it is the policy of Millennium Health to provide HCP's the flexibility to order appropriate tests in combination, and also to ensure the convenience of doing so does not compromise deliberate decision making as to which tests are medically necessary for a particular patient at a particular time. I understand that I may order any of the tests included in my Custom Profile individually, or in combination different from that reflected in my Custom Profile, using Millennium Health Test Requisition. I agree that I will contact a Millennium Health representative without delay if, at any point in time, the test combination that makes up my Custom Profile no longer reflects the needs of my patients or if, for any reason, I would like to modify my Custom Profile, I understand that each individual test component of the Custom Profile I have designed will be billed with a separate CPT code, unless indicated otherwise on this form, and acknowledge that Millennium has provided me with a complete description of the codes it uses to bill the individual tests included in my Custom Profile, and the maximum Medicare reimbursement amount for each test. I understand that the Custom Profile I have designed may call for a definitive testing as a second assay following an initial qualitative immunoassay test (conducted either in-office or by Millennium Health), and understand that it is appropriate to order this profile only when I have determined that definitive testing is medically necessary for a particular patient. I understand that the use of Custom Profiles may result in the ordering of tests which are not covered, reasonable and/or necessary and that when ordering tests for which reimbursement may be sought from Medicare, Medicaid and other federally-funded health care programs or third party payers, HCP's should be careful to order only tests that are medically necessary for diagnosis or treatment of the patient. I understand that billing a federally-funded health care program for tests that are not reasonable or necessary may violate federal law, and an authorized HCP who knowingly orders such tests may be subject to civil, criminal and/ or administrative sanctions for causing submission of a false claim. I understand the potential implications of establishing customized panels as described above and authorize Millennium Health to perform the Custom Profile I have created on this form, including each of the tests checked, each time I submit a specimen accompanied by a Test Requisition on which I have ordered my Custom Profile test option. The use of a Custom Profile is offered to me as a convenience, but there is on requirement to establish one since any test I wish to order for a patient can also be ordered on Millennium's standard Test Requisition forms. By signing this form, I acknowledge the stated understandings and authorization.

- After Alisha agreed to these terms Scott sent the forms via email to Millennium's headquarters in San Diego and then Joe contacted K&K and told them how to collect samples and send them in.[9]

- Later in April, Scott met with the owner of Dishion. They agreed to contract with Millennium for drug testing. Scott subsequently emailed Brenda Hoyt about whether she would be interested in being Dishion's health care provider. Brenda agreed to meet and then agreed to be the health care provider. On April 23, 2015, Brenda signed the New Client Registration form wherein she, too, acknowledged the following:

> I hereby acknowledge that Millennium Health (MH) will perform testing for my practice as directed by individual Test Requisition forms, which may incorporate Custom Profile (CP) if selected. I acknowledge that utilization of CP is not required and that the authorized practitioners in my practice are responsible for selecting the individual test to be performed on each patient. I agree to only order the required individual tests that are medically necessary for the diagnosis and treatment of my patients. I further acknowledge that neither I nor my immediate family members have any financial relationship with MH not expressly permitted by the "Stark" physician self-referral law and regulations, nor have I been offered or provided anything of value in exchange for referral of testing to MH.

She also, and importantly, signed an Oral Fluid Custom Profile form and Non-POC Custom Profile form selecting those drugs that she believed necessary for drug court testing. This meant that every time a test was ordered, the patient would be screened for the items selected on that custom profile. It is notable that Brenda's choices on the Custom Profile Forms were different than those selected by Alisha. While the government contends Scott had a plan that he executed between the months

---

[9] Alisha claims she didn't sign the forms. However, retired Detective Brett Quilter, a handwriting expert, provided analysis proving otherwise. The Defense respectfully requests that the Court consider the exemplars before the trial. See Defense Exhibit 2020 for a comparison of Hoyt's signature on the forms and her signature before Quilter. Further, several receipts and invoices make clear Scott was in Payette at the exact time and day she signed the forms. In particular, Scott purchased food for the meeting with Alisha and others in her office. The receipt for the food purchase was at 12:47 pm, the meeting with Alisha was at 1:00 pm, and the signed Customer Agreement forms were sent to Millennium's corporate office in San Diego at 1:17 pm Pacific Time. (See Defense Exhibit 2025 for receipts, meeting list, and signed form with email attachment indicating time of submission).

of April and March 2015, the only thing that is the same about those transactions is that Scott used

Millennium forms and Millennium procedures. It was up to the providers to decide specifically

what drugs to choose for the facilities they were taking care of patients for. Further, the fact that

the providers selected different tests supports Scott's contention that he sat down with AP and BH

and had them fill these forms out. Scott would not have known which tests to select for the

particular practices. The Oral Fluid form that Brenda signed said:

> I understand that it is the policy of Millennium Health to provide HCP's the flexibility to order appropriate tests in combination, and also to ensure that the convenience of doing so does not compromise deliberate decision making as to which tests are medically necessary for a particular patient at a particular time. I understand that I may order any of the tests included in my Custom Profile individually, or in combinations different than that reflected in my Custom Profile, using Millennium Health Test Requisition. I agree that I will contact a Millennium Health representative without delay if, at any point in time, the test combination that makes up my Custom Profile no longer reflects the needs of my patients or if, for any reason, I would like to modify my Custom Profile. I understand that each individual test component of the Custom Profile I have designed will be billed with a separate CPT code, unless indicated otherwise on this form, and acknowledge that Millennium has provided me with a complete description of the codes it uses to bill the individual tests included in my Custom Profile, and the maximum Medicare reimbursement amount for each test. I understand that the Custom Profile that I have designed may call for quantitative testing as a second assay following an initial qualitative immunoassay test (conducted either in-office or by Millennium Health), and understand that it is appropriate to order this profile only when I have determined that quantitative testing is medically necessary for a particular patient. I understand that the use of Custom Profiles may result in the ordering of tests which are not covered, reasonable and/ or necessary and that when ordering test for which reimbursement may be sought from Medicare, Medicaid and other federally funded health care programs or third party payers, HCP's should be careful to order only tests that are medically necessary for diagnosis of treatment of the patient. I understand that billing a federally-funded health care program for tests that are not reasonable or necessary may violate federal law, and an authorized HCP who knowingly orders such tests may be subject to civil, criminal and/or administrative sanctions for causing submission of a false claim. I understand the potential implications of establishing customized panels as described above and authorize Millennium Health to perform the Custom Profile I have created on this form, including each of the tests checked, each time I submit a specimen accompanied by a Test Requisition on which I have ordered my Custom Profile test option. The use of a Custom Profile is offered to me as a convenience, but there is on requirement to establish one since any test I wish to order for a patient can also be ordered on Millennium's standard Test Requisition forms. By signing this form, I acknowledge the stated understandings and authorization.

The Non-POC form that Brenda signed said:

> I understand that it is the policy of Millennium Health to provide HCP's the flexibility to order appropriate tests in combination, and also to ensure the convenience of doing so does not compromise deliberate decision making as to which tests are medically necessary for a particular patient at a particular time. I understand that I may order any of the tests included in my Custom Profile individually, or in combination different from that reflected in my Custom Profile, using Millennium Health Test Requisition. I agree that I will contact a Millennium Health representative without delay if, at any point in time, the test combination that makes up my Custom Profile no longer reflects the needs of my patients or if, for any reason, I would like to modify my Custom Profile, I understand that each individual test component of the Custom Profile I have designed will be billed with a separate CPT code, unless indicated otherwise on this form, and acknowledge that Millennium has provided me with a complete description of the codes it uses to bill the individual tests included in my Custom Profile, and the maximum Medicare reimbursement amount for each test. I understand that the Custom Profile I have designed may call for a definitive testing as a second assay following an initial qualitative immunoassay test (conducted either in-office or by Millennium Health), and understand that it is appropriate to order this profile only when I have determined that definitive testing is medically necessary for a particular patient. I understand that the use of Custom Profiles may result in the ordering of tests which are not covered, reasonable and/or necessary and that when ordering tests for which reimbursement may be sought from Medicare, Medicaid and other federally-funded health care programs or third party payers, HCP's should be careful to order only tests that are medically necessary for diagnosis or treatment of the patient. I understand that billing a federally-funded health care program for tests that are not reasonable or necessary may violate federal law, and an authorized HCP who knowingly orders such tests may be subject to civil, criminal and/ or administrative sanctions for causing submission of a false claim. I understand the potential implications of establishing customized panels as described above and authorize Millennium Health to perform the Custom Profile I have created on this form, including each of the tests checked, each time I submit a specimen accompanied by a Test Requisition on which I have ordered my Custom Profile test option. The use of a Custom Profile is offered to me as a convenience, but there is on requirement to establish one since any test I wish to order for a patient can also be ordered on Millennium's standard Test Requisition forms. By signing this form, I acknowledge the stated understandings and authorization.

After Brenda agreed to these terms, Scott returned to Dishion and advised them how to collect and submit samples.[10]

---

[10] Brenda claims she didn't sign the forms. However, retired Detective Brett Quilter, a handwriting expert, provided analysis proving otherwise, and Brenda agreed during that analysis that the signatures appear to

A couple of facts are important to note here. Scott had no ability or authority to order a drug test. The only thing he could do was establish the relationship by connecting provider and clinic and explain the process. Further, he had nothing to do with billing or invoicing and thus could not have facilitated billing for the drug testing. Finally, and of significant importance in this case, even though Scott explained that each individual test was required to be approved by Phillips or Hoyt, Millennium itself ignored this safeguard against abuse and ran the individual tests without their signatures anyway. Defense Exhibit 2003 is a blank form of the Individual Test Requisition forms that are submitted to Millennium along with each and every specimen to be tested. In every instance, K&K or Dishion ignored their obligation to obtain the signature from the provider. Instead, they submitted the tests without the required signature appearing on the form. Equally problematic is the fact that in every instance, Millennium ran the test and billed the government even though the forms lacked the most important thing—individual authorization from the ordering provider. The evidence will show that Scott explained the signature requirement. The evidence will show that in all instances, the signature requirement was not followed. In sum, the evidence will show that Scott genuinely believed that no test would be run, and then billed by Millennium without individual approval from the provider who was supposed to be authorizing the tests. The theory advanced by the government is that Scott wrongfully obtained the signatures of Hoyt and Phillips and then wrongfully instructed K&K and Dishion that they had blanket authorization to run tests. However, there was supposed to be a safeguard in place, a safeguard that Scott knew about, which would prevent unwarranted testing. This safeguard was supposed to operate in such a manner as to prevent months of

---

be hers. The government never produced a witness to the contrary. The only logical conclusion is that they signed the forms in question. The Defense respectfully requests that the Court consider the exemplars before the trial. See Defense Exhibit 2022 for a comparison of Brenda's signature on the forms and her signature before Quilter.

**SCOTT LANEY'S PRETRIAL BRIEF/ OPENING STATEMENT—15**

blanket tests without provider approval. Scott had no ability to enforce or monitor the safeguard. That obligation fell to the parties submitting the tests and, ultimately, Millennium.

**2. The rule of lenity applies to this case because the definition of medical necessity was ambiguous in 2015 and remains so to this day.**

The principle of lenity requires courts to resolve any statutory ambiguity in a criminal law in favor of the defendant. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). The principle is especially important as it applies to administrative agency interpretation with criminal penalties: "This principle rests on concerns about notice (the state ought to provide fair warning of what violates the criminal laws) and separation of powers (Congress, not agencies or courts, defines crimes)." *United States v. Bass*, 404 U.S. 336, 348 (1971). The "[Supreme] Court has never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 134 S. Ct. 1144 (2014); "[C]riminal laws are for the courts, not for the Government, to construe." *Abramski v. United States,* 134 S. Ct. 2259, 2274 (2014). While some argue that the Chevron doctrine allows agency to develop a body of law based on the "reasonableness' standard, this standard does not apply in the criminal context. The Chevron doctrine tells courts to defer to an administrative agency's reasonable interpretation of an ambiguous statute—but only where that statute is ambiguous even after the ordinary statutory canons of construction, like lenity, apply. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Additionally, without the safeguard that lenity provides, citizens are unlikely to know which laws result in criminal versus civil consequences such that they could intend to skirt those laws.

So, for example, in *Dunn v. United States*, 73 the Court opined:

> [The rule] reflects not merely a convenient maxim of statutory construction. Rather it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. Thus . . .

courts must decline to impose punishment for actions that are not "plainly and unmistakably" proscribed.[11]

Put another way, should agency interpretations of ambiguous laws with criminal applications be given deference, agencies would have the unconstitutional power to "create [and uncreate] new crimes at will, so long as they do not roam beyond ambiguities that the laws contain." Here we see application of civil law to the employer, Millennium Health, but criminal law using civil interpretations of "necessary" services, applied to the employee, Scott. The actions alleged against Scott were not plainly and unmistakably proscribed as such in 2015.

### a. Any ambiguity in the 2015 definition of medical necessity per Federal and State healthcare rules must be resolved in favor or Mr. Laney.

The government believes this to be an open and shut case of fraud simply because Scott both a) established the relationships between Millennium and K&K and Millennium and Dishion, and b) sold tests that the government claims were not reasonable and necessary as defined by the IDAPA rules in 2015. They claim he knew this but did it anyway, yet there is no proof that Scott knew what he was doing was wrong but did it anyway. In fact, the evidence will show that the definition, even today, remains ambiguous.

The government will argue that Scott set out to defraud the healthcare system by signing up entities that he knew did not meet the parameters of ordering medically necessary urine tests. The government, in

---

[11] See, e.g., *United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."); *United States v. Aguilar*, 515 U.S. 593, 600 (1995) (citation omitted) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute . . . out of concern that 'a fair warning should be given . . . .'"); *Bass*, 404 U.S. at 348 (referring to the fair warning value served by the rule); *McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("[I]t is reasonable that fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.").

order to prove that Scott tried to circumvent the rule, must first provide the legal definition of medical necessity as it was understood in Idaho in April 2015 – *and* it must prove Scott knew that rule and intentionally violated it. To do this, the government will call, not one, but two expert witnesses who work for the Idaho Department of Health and Welfare. These individuals are expected to offer a *current* working definition of when urine testing is considered medically necessary such that Medicare and Medicaid will reimburse for the cost of the test. The Government will also likely call its own investigator, Tracy Kreitzer, Special Agent for Idaho Health and Human Services. He is expected to testify to knowledge he gained through interviews and internal research. On May 26, 2017, Agent Kreitzer, in order to educate himself two years after the fact, contacted Darlene Higginbotham, the senior director of Medicare in California, to determine just what "dictates a diagnostic test" that is medically necessary and whether testing done through Pinnacle (a competitor lab testing company) met the requirements. In response to his question, she emailed Tracy a link to the applicable Federal regulations and identified Pub 100-02, Medicare Benefit Policy Manual, Chapter 15, Section 80.6-80.6.1.[12] It is not surprising that Kreitzer was required to go outside Idaho's own Department of Health and Welfare for the answer to his question.[13] Idaho's definition

---

[12] Defense Exhibit 2010.

[13] Idaho state law defining medical necessity for private insurance should likely be considered as well with regard to a criminal claim since it is the closest definition we have of medical necessity promulgated by the Idaho legislature itself. This definition defines provider as a facility and a facility can be one that is diagnostic only, meaning a facility like K&K that functions as a diagnostic service could, arguably, follow court ordered drug testing, order the diagnostic UTD and that would be a medically necessary and reasonable service. State law regarding private insurance and the definition thereof (which could also be a consideration because of interaction between Medicare and supplemental insurance) favors a situation wherein a provider could order custom profiles or order drug court tests without individualized treatment. See I.C. § 41.59: (31) "Medically necessary" or "medical necessity" means the definition provided in the covered person's health benefit plan; if the covered person's health benefit plan does not define "medically necessary" or "medical necessity," these terms shall mean health care services and supplies that a physician **or other health care provider,** exercising prudent clinical judgment, would provide to a covered person for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) In accordance with generally accepted standards of medical practice; (b) Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the covered person's illness, injury or disease; (c) Not primarily for the convenience of the covered

of a medically necessary service with respect to Medicare and Medicaid was passed in 2007 as IDAPA

16.03.09 and is as follows:

> A service is medically necessary if:
>
> **a.** It is reasonably calculated to prevent, diagnose, or treat conditions in the participant that endanger life, cause pain, or cause functionally significant deformity or malfunction; and (3-30-07)
> **b.** There is no other equally effective course of treatment available or suitable for the participant requesting the service which is more conservative or substantially less costly. (3-30-07)
> **c.** Medical services must be of a quality that meets professionally-recognized standards of health care and must be substantiated by records including evidence of such medical necessity and quality. Those records must be made available to the Department upon request. (3-30-07)

The applicable definition fails to clearly specify whether drug court testing or testing if a patient

has not been readily seen by a practitioner is, or is not, medically necessary. There isn't even a

requirement for a doctor sign off. The question as to whether diagnostic tests to determine if an at-risk

population is using drugs or not is not answered by analyzing the rule. One could easily argue, especially

with the lack of any guidance in 2015, that a court ordered drug test is, in fact, reasonably calculated to

prevent, diagnose or treat a condition (addiction) that can endanger life, cause pain or malfunction. In

other words, this rule can easily be read in such a manner, especially by a layman, to justify the tests that

---

person, physician or other health care provider; and (d) Not more costly than an alternative service or sequence of services or supply, and at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the covered person's illness, injury or disease. For these purposes, "generally accepted standards of medical practice" means standards that are based on credible medical or scientific evidence. (25) **"Health care provider"** or "provider" means a health care professional or a facility. (21) **"Facility"** means an institution providing health care services or a health care setting, including, but not limited to, hospitals and other licensed inpatient centers, ambulatory surgical or treatment centers, skilled nursing centers, residential treatment centers, diagnostic, laboratory and imaging centers and rehabilitation and other therapeutic health settings.

are at issue here. This criminal prosecution is nothing more than a case brought in the clarity of hindsight. Now the government wants to apply criminal consequences to an alleged rule violation in 2015 but made no effort to clarify or explain until at least 2017. Several months after Kreitzer contacted Higgenbotham, we find that Idaho's health agency did not change agency rule via the necessary route of IDAPA but instead only issued guidance by way of its monthly newsletter for Providers, *Medicaide*.[14]

The federal regulations that Higgenbotham offered to Kreitzer essentially say that a test is not medically necessary just because a provider (this could be a physician or qualifying non-physician) orders it. Rather additional parameters must be met - such as the patient having a treatment relationship with the provider. There must be more documentation than a urine lab test form, in other words. IDAPA does not now, and did not in 2015 specify this, though. The clarification that fits more closely with the Higgenbotthom response, though, seems to have first been made known publicly in the newsletter, *Medicaide*, in November 2017. This guidance offered more specificity than IDAPA. In the March 2020 *Medicaide* newsletter to providers, it reminded providers that "the November 2017, June 2018 and August 2018 *Medicaide* articles established the following as non-covered, non-medically necessary by Idaho Medicaid:

- Tests performed as a result of blanket orders;
- Definitive tests done reflexively with a presumptive test;
- Tests performed on routine or standing physician orders; . . .
- Tests as a condition of probation"[15]

In short, the Government seems to believe this definition is so complex that even an experienced United States District Judge, with highly intelligent law clerks at his disposal, requires the assistance of

---

[14] Defense Exhibit 2011. The front page of the Idaho Department of Health and Welfare 2015 weekly Remittance Advice reports sent to Millennium reminds of the online availability of *Medicaide*. an administrative agency resource ("An Informational Newsletter for Idaho Medicaid Providers) not ever sent to or suggested to him as a resource he should read and understand.

[15] Defense Exhibit 2012. See pages 2-3.

not just one, but *two* expert witnesses to help the court understand just what this rule means. This Court has the legal expertise to research and define the law, certainly. And actually, with regard to the law as it relates to criminal law, this Court is constitutionally obligated to do so versus deferring to administrative agency guidance. Scott Laney, of course, had none of these resources at his disposal in the spring of 2015. Nor did he have the senior director of Medicare to confer with. Nor did he have clarification from Idaho's own agencies. In fact, the evidence will show that the definitions and parameters of what a medically necessary urine test was understood to be in 2015, was unclear to many providers and entities throughout the United States. As for Idaho, in 2015 and even to this day, the rule remains the same with providers only being able to rely on guidance from a monthly *newsletter* to shed light on the question. Of serious concern in the government's handling of this case is the fact that it appears to be enacting agency law by enforcing nothing more than guidance (via the newsletter, *Medicaide*) through criminal prosecution rather than enforcing actual law (IDAPA) where the definition of medical necessity is broader and even according to guidance, where if overpayment occurs, civil remedies versus criminal punishment exist.[16] The evidence will show that the government has actually been paid back *twice* for the tests in question. The Government contends that it is the Federal statute regarding reimbursement to Medicare that holds here. However, Medicaid is governed by both state and federal law. At any rate, a closer look at IDAPA must be considered. The government's contention that in 2015, a plain and unmistakable definition of medical necessity existed such that Scott would have understood it, is patently false. If it were true, the

---

[16] Defense Exhibit 2013. The fact that it appears the Justice Department is making law by enforcing agency publications is an additional serious problem in this case. It is Defendant's understanding that a January 25, 2018 DOJ internal memorandum, prohibits DOJ from using "its enforcement authority to effectively convert agency guidance documents into binding rules." If true for civil actions under the False Claim Act, how much more so for criminal ones. Also available at https://www.justice.gov/file/1028756/download

government wouldn't be consulting outside experts and then bringing them to court to help 'splain it to the Judge.

Here, we have several layers of applicable rules, mostly agency statutes wherein the government is relying on administrative agency definitions to define prohibited conduct, definitions that were not made known to the public or to a salesperson unless the salesman worked for a company that educated its staff and safeguarded its staff. Clearly, as will be seen next, the Corporate Integrity Agreement (CIA) and the Millennium's follow-up changes in marketing and materials that salesman could distribute, prove that Scott was never educated as to how an administrative agency was defining law and certainly not given plain and unmistakable directives that would prevent indictment.

**b. Certainly, Scott's employer, Millennium did not understand the definition of medically necessary and reasonable and thus was sued by the government, paid significant fines, and agreed to change its practices in the fall of 2015.**

Unbeknownst to Scott, at the very same time he was signing K&K and Dishion up in April 2015 as Millennium Custom Profile Customers, Millennium was defending a massive civil lawsuit brought against it by the United States that related to Millennium's illegal use of Custom Profile forms - the very sales practices that are in issue in this case. In fact, in 2014, the United States began intervening in suits against Millennium alleging that "Millennium was warned by consultants, customers, competitors, insurers and regulators that its marketing schemes were illegal. Millennium nonetheless pressured its employees into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure."[17] In October of 2015, MH entered into a Corporate Integrity Agreement and Settlement

---

[17] Defense Exhibit 2014. *United States of America (Intervenor) v. Millennium Laboratories and Millennium Health*, March 2015. No. 12cv10132-NMG and see the Department of Justice's October 19, 2015 news release for a list of all the related cases: https://www.justice.gov/opa/pr/millennium-health-agrees-pay-256-million-resolve-allegations-unnecessary-drug-and-genetic

Agreement[18] and reimbursed the government **$256,000,000** for overpayment. It promised that within 90-120 days of signing the CIA, among many other things, to ensure sales and marketing staff received appropriate training regarding "the importance of medical reasonableness and necessity in Millennium's claim submissions, sales and marketing, and communication with customers; . . . . the legal sanctions for violations of the Federal health care program requirements". Millennium had failed to provide any such training prior to that date. It was only after paying hundreds of millions of dollars in penalties, and settling a federal lawsuit, that Millennium undertook these corrective measures. That settlement payment included the state of Idaho.[19]

The salient terms of the Corporate Integrity Agreement as they related to sales of UDT's are as follows:

- Compliance with statutes, regulations, and written directives of federal health programs, including Medicare and Medicaid

- A Chief Clinical Officer position will be created within 90 days. Responsibilities include:

  > reviewing and approving policies, procedures, and practices related to any clinical decision-making, including, but not limited to, reviewing standard requisition forms, reviewing and approving any clinical content included in any Sales and Marketing Materials, and implementing and monitoring risk assessment and internal audit programs that review referral patterns and practices to identify and address situations where referral sources may be ordering medically unnecessary tests (p. 6)

- Creating policies and procedures and requisition forms that are consistent with national and local coverage determinations, specifically so that "all forms shall boldly state that Medicare will only pay for tests that are medially reasonable and necessary based on the clinical condition of each patient", that providers may not use custom profile forms (p. 11).

---

[18] Defense Exhibit 2015. Also see https://www.justice.gov/opa/pr/millennium-health-agrees-pay-256-million-resolve-allegations-unnecessary-drug-and-genetic

[19] Defense Exhibit 2016. See also at https://www.ag.idaho.gov/newsroom/millennium-health-agrees-to-pay-256-million-to-resolve-allegations-of-unnecessary-drug-and-genetic-testing-and-illegal-remuneration-to-physicians/

- Written standards must be created that emphasize "the importance of medical reasonableness and necessity in Millennium's claim submission, sales and marketing, and communication with customers." (p. 12).

- "Sales representatives may only respond to requests for information about the medical reasonableness and necessity of Government Reimbursed Services . . . [by using] only materials that have been reviewed and approved by Millennium; and respond to the physician on questions regarding medical reasonableness and necessity of Government Reimbursed Services as previously approved by the Chief Clinical Officer, and to refer the physician to the Chief Clinical Officer in all other instances." (pp. 12-13)

- Training includes federal health care program requirements and the legal sanctions for violations of the Federal health care program requirements (p. 15).

- Initiate a records review process.

- Monitor Field Force by observing sales representatives and "ensure that sales representatives are not making any statements regarding medical reasonableness and necessity outside the scope of Millennium's Policies and Procedures (but, rather, are referring matters related to medical reasonableness and necessity not covered by Millennium's Policies and Procedures to the Chief Clinical Officer, as appropriate)."

- Agreement on corrective behavior plan if a salesperson does not follow the new policies and procedures and agreement as to penalty amounts that Millennium would pay the government in the event Millennium Health breaches the agreement such as not reporting an event wherein a salesperson may have committed health care fraud.

These are all practices that, had they been in place in 2015, would have prevented the sales practices that resulted in the allegedly unnecessary and unreasonable services being billed, the very things Scott is being prosecuted for now. It should be noted that no court weighed in on the terms of the agreement. Thus, simply by bringing suit against Millennium, the government, relying on Administrative Agency analysis, in effect is changing law without the legislature, either state or federal.

Regardless, after this agreement was made, in 2016 (and after Scott was no longer employed by Millennium), Millennium Health created what it called a "Playbook".[20] This was a sales training manual for the sales staff. This was not Playbook 2.5 or even 1.2. Rather this was the first of its kind. The manual

---

[20] Defense Exhibit 2017.

clearly reflects the terms of the CIA and federal agency's definition of medical necessity. Salespeople were then given new forms and separate templates to use to help educate existing Millennium clients when they had questions about the Millennium changes with Custom Profiles and other UDT questions:[21] These templates reflected the verbiage in the Playbook as well. An example page from the template follows:

**Payer Policy Message**
**This message would be utilized when educating a practice/provider on a UDT policy that requires a change in the way they order lab tests in order that they (and we) follow such UDT policy.**

(Addressing Provider)

Thanks for your time today. We are here to address changes to some of the health plans that you see in your practice regarding the ordering of UDT and or PGT.

Recent policy changes from Medicare Administrative Contractors and commercial insurers have provided clarity regarding utilization criteria for Drug Testing (e.g., UDT/OFT). Additionally, Medicare and other insurers have instituted medical necessity criteria for drug testing and are increasingly expecting health care providers (HCPs) to comply with these criteria.
As a service provider to your practice, we want to be a resource to you regarding the ever-changing landscapes. One way we can do this, is by keeping you abreast of what these payer policies may be, and furthermore, providing you with options and solutions to stay within the guidelines of each specific insurance plan.

The template then continues:

As part of our commitment to patient care, we are taking steps to work collaboratively with HCPs and insurers to inform them about medical necessity and utilization criteria for drug testing. [All questions regarding medical necessity and utilization criteria for drug testing that are outside of playbook messages and/or training MUST be directed to the Chief Clinical Officer.]

But even the "Playbook", as the above template response notes in bold as well, puts the onus of understanding and explaining medical necessity onto the "Chief Clinical Officer or the Clinical Affairs Team." p. 59 under the Question of "How often should I test my patients?" Page 67 details, not that the sales person would understand Federal regulations, but MH's training materials on medical necessity:

---

[21] Defense Exhibit 2018.

"MH sales representatives may only respond to questions, in any form, from Health Care Providers regarding medical reasonableness and necessity of Government Reimbursed Services consistent with training, information and promotional materials approved by Millennium Health's Chief Clinical Officer." Medical Necessity Documentation Tools that were not available for Scott or used before were now available and required to be used with providers. See p. 73. Additionally, p. 51 *finally* advises a salesperson how to explain why Custom Profiles are no longer available for use since they might result in tests being conducted that are not medically necessary. The fact that Custom Profiles are no longer available for use after providers had been told on the very Custom Profile forms that choosing custom profiles was not illegal because the one-for-all form still constituted medical necessity, is highly problematic for the government's case against Scott. How, if Millennium itself did not know or at least was sending its salespeople out with forms that were illegal, would Scott have understood the practice of Custom Profiling to be anything but perfectly legitimate?

Long after the conduct giving rise to these charges occurred, on the federal side, not just Idaho, Federal administrative agency policy announcements began to come out that the problem of unreasonable and unnecessary UDT practices was a nationwide problem, not just a Millennium or Scott Laney problem. In September 2016, The Department of Health and Human Resources released a "Provider Compliance Tips for Laboratory Tests- Other- Urine Drug Screening" which included links to federal regulations and the Medicare Benefit Policy.[22] The reason this was released was that "[b]ased on the Supplementary Appendices for the Medicare Fee-For-Service 2015 Improper Payments Report, Laboratory Tests—Other, which includes urine drug screenings, had an improper payment rate of 39 percent and accounted for a projected $1.2 billion in Medicare FFS improper payments. The vast majority of these improper payments

---

[22] Defense Exhibit 2019. Exhibit also available online at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/ProviderComplianceTipsforLabTests-Other-ICN909412.pdf

were due to insufficient documentation." A review of that report, shows additionally that 19.7% of the errors were due to urine tests that were not medically necessary.[23]

As noted previously, Idaho released more specific requirements for providers in Idaho by way of the *Medicaide* newsletter. However, this was not published until November of 2017—two and a half years after all of this happened. Further, it was, administrative agency guidance, not law, and leastwise not the sort that Scott should be held criminally liable for after the fact. In no way does the administrative agency analysis indicate that the application applies to actions in years past. Moreover, even today, a salesperson would be unlikely to know the application of Idaho administrative agency definitions of medically necessary unless it worked for a company that adopted such a definition and trained its staff accordingly. To be sure, Millennium did not make training its staff on reimbursement and legal sanctions for violations of the Federal health care program until it was forced to, long after Scott's dealings with K&K and Dishion. (See CIA, p. 16, C.b.iii). These newsletters are directed at providers and businesses specifically concerned with Medicaid reimbursement versus laypeople or sales staff.

### 3. Scott could not have known that the relationship he helped develop between Millennium and the two drug testing facilities and that the related ordered urine tests were illegal.

The evidence and testimony, then, will show that Scott could not have intended to defraud Medicare and Medicaid because he had no training regarding the regulations and did not create a scheme in which to defraud. In fact, had he continued with Millennium in 2016, he *still* would not have been trained on anything but the very basics, basics where documents and explanations were at least available or hotlines were provided in which to direct his questions. The template handed to salespeople in 2016

---

[23] See https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/CERT/CERT-Reports-Items/Downloads/AppendicesMedicareFee-for-Service2015ImproperPaymentsReport.pdf

directs them to tell providers and facilities that if they have questions about what a reasonable and necessary service is, then they should contact the Chief Clinical Officer! In other words, employees in Scott's position were effectively gagged!

The CIA, which the government agreed to the terms of, characterizes the salesperson as one of the least culpable persons. In fact, the CIA clearly says that the duty for understanding and overseeing the regulatory scheme are managers and above. For salespeople, an internal "disciplinary policies and procedures, including corrective action plans as appropriate, for violations of Millennium's Policies and Procedures." p. 14, CIA. There is good reason why Scott was never given a corrective action plan or that there were no records in his file of his intentionally circumventing federal health care law: at the time, Scott was doing exactly what Millennium had trained and expected. Worse, the evidence will show that not only was Scott never trained on health care regulations regarding medical necessity, he was actually pressured by Millennium to create relationships with entities based on Millennium's incorrect application of existing law. Further, Scott would not have noticed otherwise or heard otherwise from Idaho providers, because Idaho itself had not realized that the fee-for-service plan was being handled such as it was by urine testing companies. Because Millennium trained Scott otherwise and industry standards were otherwise, the government cannot prove beyond a reasonable doubt that Scott knew the correct regulations and then intentionally circumvented them for his own gain.

Additionally, after the CIA was signed in October 2015 and even after January 2016 when salesmen training on the issue was to have taken place, Millennium failed to send Scott back out to previously contracted entities to correct the paperwork even though this was specifically mandated by the CIA. In fact, the evidence will show that the exact same charges continued to be paid by the Government on Scott's K&K and Dishion accounts, months *after* the CIA was signed! After the relationships in question were established, Scott as a salesman, had no other obligation to oversee or work with the parties

unless Millennium would have instructed him to. Of course, by 2016, K&K had switched companies when Joe switched them to Pinnacle with he and "Billy" as the sales contact. Thus, Laney would have had no way, after being instructed on the correct understanding of medical necessity and disuse of Standing Orders and Custom Profiles, of correcting any of the claims the government charges him with.

Kristen Baker, a regional manager for Millennium, explained in an interview to Agent Kreitzer that in 2015 Millennium reacted to the government's decisions about not using Custom Profiles. Millennium "made the changes state-by-state, starting with California, and had a grace period for transition." How can Scott, then, be criminally liable with counts for actions with regard to medical necessity that were not at all clear in Idaho? For instance, Counts 1-8 all occurred before the October 2015 CIA and long before the salesmen would have been retrained beginning in January 2016. Count 9 occurred in March 2016 after Scott was no longer employed at Millennium and appears to be a billing from K&K's relationship with Pinnacle. Thus, it was definitely out of Scott's purview. At any rate, Joe Johnson was the customer support representative with a different commission contract and a different set of responsibilities. That is why Kim Rostad of K&K explained in her interview, and is expected to testify at trial, that it was Joe who she dealt with most, Joe who came up with the name K&K Treatment and Joe who switched K&K over to Pinnacle. Joe admitted that he was the person who filled out the paperwork designating Phillips as the medical director for the Pinnacle/ K&K relationship. He did so without her knowledge or consent. As to that issue, she is justifiably upset. However, Joe Johnson is the person who committed this crime, not Mr. Laney.

### a) Scott's payments to Joe do not prove Scott's intent to defraud health programs because Scott and Joe had a history of splitting commissions.

The government intends to offer proof that Scott offered Joe money as a way shut him up. In fact, Joe and Scott had a commission sharing agreement. If they both were marketing to a company and had to

cover for one another given the driving distances in this sales territory, they would decide beforehand how much commission percentages to split. It appears the government will try to argue that these commission payments from Scott's business account to Joe's business account are proof that Scott was trying to get Joe not to talk about the MH dealings with the government. Actually, when Kreitzer interviews Joe, he suggests to Joe that the payments be characterized as "hush money." That transcript will be available for trial since Agent Kreitzer inaccurately reported that it was Joe who said "hush money" rather than Kreitzer planting that seed for Joe to mentally germinate.

Scott will testify that the amounts the government has targeted as proof of "hush money" were actually typical commission payments for Joe's help with sales ideas; these specifically are Nepenthe Lab sales commissions. Joe was helping Scott come up with ideas for accounts to call on with Nepenthe and the other labs he was working with. In exchange, Scott would pay him for his help once Scott started to earn enough commissions to do so. Both determined the amount Scott would pay Joe based on the following: Joe's base salary plus commissions, car/phone allowance and health insurance benefits. If in a given month Scott made more than that amount, the two would split whatever was left over. They eventually switched to a flat fee of $1,300.00 instead of the roundabout formula mentioned above. Scott's work for Nepenthe is not part of the Government's claims against Scott. Neither does it appear that these payments are being offered as anything other than alleged proof of scienter—something they fail to prove.

## V. CONCLUSION

Criminally charging Scott for Millennium's scheme, one for which it has signed a CIA for, paid civil restitution for, is tantamount to indicting a Volkswagen salesman in the United States because the engineers in Germany decided to rig Passats so that they would falsely pass emissions tests. Just as the car salesman would have no knowledge of an unreasonable risk of harm or the right or ability to control

the engineers' conduct, neither did Scott with respect to controlling Millennium Health labs or marketing and sales procedures. Just as the purchaser of a Passat would not sue the Volkswagen salesman with respect to the emissions problems of a Passat, especially after Volkswagen has admitted the fraud and paid for it, the government has no reason to indict Scott for not knowing the definition of and application of medical necessity to urine tests in 2015. A conviction in this case is nothing more than the government demanding that Scott be held accountable for conduct in 2015 that he could not have possibly known to be wrong until at least the end of 2017.

Scott Laney, following explicit instructions from Millennium, located nurse practitioners who were willing to associate with K&K and Dishion for the purpose of ordering urine tests needed by their agencies. Even so, the government now alleges 1) that by signing K&K and Dishion up for Millennium laboratory testing in April 2015, Scott defrauded Medicare and Medicaid when they later reimbursed Millennium for urine tests ordered through K&K and Dishion; 2) that Scott unlawfully used practitioners' names and provider numbers to establish a relationship between the companies and MH; and 3) that criminal monetary penalties are required. The evidence at trial, however, will show that Scott followed Millennium directives and procedures in good faith, genuinely believing that what he was doing was perfectly acceptable; 2) that the practitioners willingly gave permission for their provider numbers to be used for lab testing; and 3) because the remedy for overpayment are civil sanctions and because the amounts alleged against Scott have already been paid by Millennium (twice), he does not owe the government money and should not be facing criminal penalties at all. For these reasons, the evidence will show that Scott is not guilty of the charges the government alleged against him.

Respectfully submitted this 14th day of September 2020.


/s/    Dennis M. Charney
Dennis M. Charney
Attorney for Scott Alexander Laney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 14th day of September, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent a notice of electronic filing to all parties on the electronic mail  notice list.


/s/  Dennis M. Charney_____
Dennis M. Charney